## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| vs.    ) | Case No.: 1:16-CV-1103 (NAM/CFH) |
| ) | |
| GRIMMEL INDUSTRIES, LLC, and    ) | |
| RENSSELAER IRON & STEEL, INC.,    ) | |
| and TOBY GRIMMEL    ) | |
| ) | |
| Defendants.    ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, the United States of America, by authority of the Attorney General of the

United States, at the request of the Administrator of the United States Environmental Protection

Agency ("EPA"), by and through their undersigned attorneys, with respect to claims under

federal law, allege as follows:

## INTRODUCTION

1.      This is a civil action for injunctive relief and civil penalties brought pursuant to

Section 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d), against

Grimmel Industries, LLC ("Grimmel LLC"), Rensselaer Iron & Steel, Inc. ("Rensselaer Iron &

Steel"), and Toby Grimmel (collectively, "Defendants") for failure to comply with the conditions

of the Defendants' State of New York Multi-Sector General Permit for Stormwater Discharges

Associated with Industrial Activity ("MSGP") issued pursuant to Section 402 of the CWA, 33

U.S.C. § 1342, at the Defendants' scrap metal facility in Rensselaer, New York.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action and the parties

pursuant to 28 U.S.C. §§ 1331, 1345 and 1355, and 33 U.S.C. § 1319(b).

3.      Venue is proper in this District pursuant to 33 U.S.C. § 1319(b), and 28 U.S.C. §§

1391 and 1395, because Defendants conduct business in this District and because the violations

occurred in this District.

4.      Notice of commencement of this action has been given to the State of New York

in accordance with 33 U.S.C. § 1319(b).

5.      Authority to bring this civil action is vested in the Attorney General of the United

States pursuant to Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

## DEFENDANTS

6.      Grimmel LLC is a corporation organized and existing under the laws of Maine.

7.      Grimmel LLC's business address is P.O. Box 246, Rensselaer, New York.

8.      Rensselaer Iron & Steel is a corporation organized and existing under the laws of

New York whose principal place of business is located at 35 Riverside Avenue, Rensselaer, New

York 12144 (the "Facility").

9.      Grimmel LLC is the owner of the Facility.

10.     At relevant times herein, Grimmel LLC has been an owner of the Facility.

11.     Grimmel LLC is an operator of the Facility.

12.     At relevant times herein, Grimmel LLC has been an operator of the Facility.

13.     Grimmel LLC is a closely held corporate entity.

14.     Grimmel LLC is a "person" as defined in Section 502(5) of the CWA, 33 U.S.C.

§ 1362(5), 40 C.F.R. § 122.2.

15.     Rensselaer Iron & Steel is the owner of the Facility.

16.     Upon information and belief, at relevant times herein, Rennselaer Iron & Steel has been the owner of the Facility.

17.     Rensselaer Iron & Steel is the operator of the Facility.

18.     Upon information and belief, at relevant times herein, Rensselaer Iron & Steel has been the operator of the Facility.

19.     Rensselaer Iron & Steel is a closely held corporation.

20.     Rensselaer Iron & Steel is a "person" as defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5), 40 C.F.R. § 122.2.

21.     Upon information and belief, at relevant times herein, Toby Grimmel has been the Vice President of Rensselaer Iron & Steel.

22.     Toby Grimmel is the Vice President of Rensselaer Iron & Steel.

23.     At relevant times herein, Toby Grimmel has been the Vice President of Rennselaer Iron & Steel.

24.     Toby Grimmel is the Facility Manager of the Facility.

25.     At relevant times herein, Toby Grimmel has been the Facility Manager of the Facility.

26.     Toby Grimmel is a "person" as defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5), 40 C.F.R. § 122.2.

## STATUTORY AND REGULATORY AUTHORITY

27.     The Clean Water Act is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

28.     To accomplish the objectives of the CWA, Section 301(a), 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person either in violation of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, or by any person without such a permit.

29.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as, among other things, "any addition of any pollutant to navigable waters from any point source."

30.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines a "pollutant" to include, among other things, solid waste, chemical wastes, wrecked or discarded equipment, rock, sand, and industrial waste discharged into water.

31.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "waters of the United States."

32.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines a "point source" as including "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged."

33.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires a permit for stormwater discharges associated with industrial activity.

34.     EPA regulations define "storm-water discharge associated with industrial activity" to include stormwater discharges from facilities involved in the recycling of materials, including metal scrapyards classified as Standard Industrial Classification ("SIC") Code 5093. 40 C.F.R. § 122.26(b)(14)(vi).

35.     Section 308 of the CWA, 33 U.S.C. § 1318, requires owners and operators of point sources to submit information to the EPA as needed to carry out the objectives of the CWA, including the NPDES permit program of Section 402 of the CWA, 33 U.S.C. § 1342.

36.     Pursuant to Sections 308 and 402 of the CWA, 33 U.S.C. §§ 1318 and 1342, EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.1 *et seq.*  Dischargers of stormwater associated with industrial activity are required to apply for an individual permit or seek coverage under a general permit. 40 C.F.R. § 122.26(c)(1).

37.     Pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), EPA may designate a state as the permitting authority for Section 402 permits.

38.     EPA granted the State of New York the authority to issue State Pollutant Discharge Elimination System ("SPDES") permits for all areas of the State other than Indian country, pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

39.     The New York State Department of Environmental Conservation ("NYSDEC") is the agency with the authority to issue SPDES permits pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).  Under this authority, NYSDEC has promulgated an MSGP.

40.     General Permit ("GP") 0-12-001 ("current MSGP") became effective on October 1, 2012, and expires on September 30, 2017.  GP-0-11-009 ("2012 MSGP") was effective from March 27, 2012, to September 30, 2012.  GP-0-06-002 ("2007 MSGP") was effective from March 28, 2007, to March 26, 2012.

41.     Under the current MSGP, a facility discharging stormwater associated with industrial activities is required to, among other things, submit a Notice of Intent to comply with the general permit ("NOI"); prepare and implement a Storm Water Pollution Prevention Plan

("SWPPP"); conduct inspections and monitoring; prepare reports; keep records; and train employees.

42.     Pursuant to 40 C.F.R. § 122.41(a) and 40 C.F.R. § 123.25(a), SPDES permittees must comply with all conditions of their SPDES permits, and any permit noncompliance constitutes a violation of the CWA.

43.     Under Sections 309 and 402(i) of the CWA, 33 U.S.C. §§ 1319 and 1342(i), the United States retains concurrent authority to enforce SPDES violations.

44.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the commencement of a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

45.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4 establish civil penalties for violations of the CWA, including violations of any condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  The maximum civil penalty per day per violation of the CWA for violations occurring after January 12, 2009 is $37,500, and $51,570 per day per violation of the CWA for violations occurring after November 2, 2015.

## GENERAL ALLEGATIONS

46.     Upon information and belief, Defendants are owners and/or operators of the Facility within the meaning of 40 C.F.R. § 122.2, and are, therefore, required to obtain permit coverage for the Facility's stormwater discharges and to comply with all applicable requirements and conditions under the CWA, its regulations, and the MSGP.  33 U.S.C. § 1342; 40 C.F.R. §§ 122.21, 122.26.

47.     Defendants "discharged pollutants" within the meaning of Section 502(12) of the CWA, 33 U.S.C. § 1362(12), because stormwater runoff from the Facility's waste and product stock piles, and vehicle dismantling, shredding and truck fueling areas, drains to assorted catch basins that discharge to an outfall, which in turn discharges to the Hudson River.

48.     The Hudson River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

49.     The Facility's outfall described in Paragraph 47 constitutes a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

50.     On March 10, 2008, Defendants sought coverage under New York's MSGP program by submitting an NOI ("2008 NOI").

51.     On January 2, 2013, Defendants sought coverage under the current MSGP by submitting an NOI ("2013 NOI").

52.     In both the 2008 NOI and 2013 NOI, Defendants listed the Hudson River as the nearest surface waterbody into which site runoff discharges.

53.     Pursuant to Section 303(d) of the CWA, 33 § 1313(d), at relevant times herein, the Hudson River has been identified as an impaired waterbody for polychlorinated biphenyls ("PCBs") for the portion of the river adjacent to the Facility.

54.     PCBs can cause a number of different harmful effects, including but not limited to: acne, rashes, irritation of the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, depression, and fatigue.

55.     EPA and the International Agency for Research on Cancer have determined that PCBs are probably carcinogenic to humans.

56.     As Facility Manager, Toby Grimmel operates the Facility.

57.     At relevant times herein, Toby Grimmel is or has been the SWPPP Coordinator and/or Team Leader for the SWPPP Team.

58.     Toby Grimmel's responsibilities as SWPPP Coordinator and/or Team Leader presently include or have included:

    a.   implementation of the SWPPP, including inspections, sampling and visual monitoring, employee training, purchasing of relevant pollution control materials, good-housekeeping, record-keeping, report submittals, and spill prevention and control measures;

    b.   implementing the preventative maintenance program; and

    c.   serving as spill response coordinator.

59.     At relevant times herein, Toby Grimmel routinely signed the following types of documents submitted to the NYSDEC, the Facility's regulator:

    a.   annual certifications and annual certification reports;

    b.   discharge monitoring reports;

    c.   corrective action forms;

    d.   at least one NOI; and

    e.   Notices of Modification ("NOM") to the Facility's permit coverage.

60.     Toby Grimmel signed the forms described in the above-listed paragraph as owner/operator of the Facility.

61.     Toby Grimmel has been the named recipient of correspondence from the NYSDEC regarding environmental compliance at the Facility.

62.     On information and belief, at relevant times herein, Toby Grimmel managed, directed, or made decisions about environmental compliance, including stormwater permit compliance, at the Facility.

63.     Toby Grimmel had responsibility and authority either to prevent or promptly correct the violations alleged in this Complaint, and failed to do so.

64.     Toby Grimmel is a responsible corporate officer under the CWA regarding the violations alleged in this Complaint.

## FIRST CLAIM FOR RELIEF
### (Violation for Discharge in Excess of Permitted Limit)

65.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 64 as though fully set forth herein.

66.     Part VIII of the current MSGP sets forth requirements "that apply to the specific *industrial activity* located at the *owner or operator's* facility." (Emphasis in original.)  The specific requirements are organized by sector.

67.     The Facility is subject to the requirements of Sector N (Scrap Recycling & Waste Recycling Facilities).

68.     Sector N of the current MSGP is further organized into Subsectors, N-1 through N-6.

69.     Part VIII of the current MSGP requires facilities that operate a shredder to follow the requirements of Subsector N-4.

70.     Defendants operate a shredder at the Facility and are therefore subject to the requirements of Subsector N-4.

71.     Table VIII-N-1 of the current MSGP provides numeric effluent limitations for mercury (50 ng/L) and PCBs (200 ng/L per Aroclor) applicable to Subsector N-4 facilities.

72.    Part IV.B.1.g of the current MSGP provides quarterly monitoring requirements for PCBs.

73.    Part IV.B.1.g.(5)(b) of the current MSGP states that an exceedance of the numeric effluent limitations constitutes a violation of the MSGP.

74.    Defendants reported a discharge of 200 ng/L of mercury in sampling conducted on June 11, 2013.

75.    Defendants reported a discharge of 1,300 ng/L of mercury in sampling conducted on August 5, 2014.

76.    Defendants reported a discharge of 2,200 ng/L of PCBs for each of the seven (7) Aroclors (1016, 1221, 1232, 1242, 1248, 1254 and 1260) in sampling conducted on August 5, 2014.

77.    Defendants reported a discharge of 374 ng/L of PCBs for Aroclor 1242 in sampling conducted on December 1, 2015.

78.    Defendants exceeded the effluent limitations for mercury and PCBs.

79.    As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

## SECOND CLAIM FOR RELIEF
### (Permit Violation for Failure to Comply with Corrective Action Requirements)

80.    The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 79 as though fully set forth herein.

81.    Part IV.B.1.g.(6) of the current MSGP requires that when an exceedance of an effluent limitation occurs, the Defendants must report their corrective action to NYSDEC no later than 14 days after the end of the monitoring period in which the exceedance occurred.

82.     Part IV.B.2.b.(2) of the current MSGP requires that monitoring and analysis be conducted according to test procedures approved under 40 C.F.R. Part 136, or equivalent, unless other test procedures have been specified in the MSGP. 40 C.F.R. Part 136 Table 1C specifies EPA Method 608 for PCB analysis and EPA Method 608 Table 1 includes a method detection limit of 0.065 ug/L for PCB Aroclor 1242. The method detection limit is the minimum concentration of a substance that can be measured and reported with 99% confidence that the value is above zero.

83.     On July 1, 2013, the NYSDEC received Defendants' Discharge Monitoring Report ("DMR") indicating the Defendants' effluent discharges were "less than 0.3ug/L" or 300 ng/L for PCBs.

84.     On August 27, 2013, the NYSDEC notified the Defendants that the reported value for PCBs constituted an exceedance and that Defendants were required to submit a Corrective Action Form no later than 14 days after the end of the monitoring period in which the exceedance occurred.

85.     The Defendants submitted a Corrective Action Form to the NYSDEC on September 12, 2013.

86.     The Defendants' DMR for the first quarter of 2014 reported effluent discharges of "less than 0.3 ug/L" for PCBs.

87.     The Defendants' DMR described in Paragraph 86 indicated a potential exceedance of permitted effluent limitations for PCBs, which triggered corrective action requirements.

88.     The Defendants, however, failed to report the corrective action to the NYSDEC within 14 days after the end of the monitoring period in which the exceedance occurred.

89.     As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

### THIRD CLAIM FOR RELIEF
**(Permit Violations for Inadequate MSGP Coverage and SWPPP Content)**

90.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 89 as though fully set forth herein.

91.     Part III.A of the current MSGP, 2012 MSGP, and 2007 MSGP (collectively "MSGPs") require that Defendants develop and implement a SWPPP for the Facility.

92.     Part III.C of each of the MSGPs specifies that a facility's SWPPP must comply with the requirements listed for all applicable sectors if it is a facility with co-located industrial activities.

93.     The Facility has co-located industrial activities as defined in Appendix A of the MSGPs because in addition to operating scrap and waste recycling activities, Defendants conduct industrial activities classified under Sector M of the MSGPs (Automobile Salvage Yards; SIC Code 5015) and Sector P of the MSGPs (Land Transportation and/or Warehousing; SIC Code 4212-4231) at the Facility.

94.     Part I.C.1 of the MSGPs requires permittees to utilize all applicable industrial sector codes because each sector has specific monitoring and SWPPP requirements.

95.     Defendants' NOIs, received by NYSDEC on January 2, 2013, and March 11, 2008, identify only Sector N (Scrap Recycling and Waste Recycling) operations.

96.     Defendants submitted a Notice of Modification to NYSDEC to add coverage under Sectors M and P, which became effective on November 19, 2014.

97.     Defendants failed to obtain permit coverage as required by Part I.C.1 of the MSGPs for their Sectors M and P operations from March 11, 2008, to November 18, 2014.

98.     Defendant's NOIs, received by NYSDEC on January 2, 2013, and March 11, 2008, identify only Grimmel Industries LLC and Grimmel Industries as the Owner/Operator and legally responsible party.

99.     Part III.C of the current MSGP provides the minimum requirements, in addition to applicable sector(s) requirements, for contents of a SWPPP.  Minimum requirements include, among other things:

> a.  <u>Stormwater Flows</u>.  Part III.C.2 of the current MSGP requires the SWPPP to include a description and site map of stormwater flows at the facility and from adjacent properties.
> b.  <u>Site Map</u>.  Part III C.6 of the current MSGP provides a list of items that are required to be identified on a site map including, but not limited to:
>> i.   size of the property in acres;
>> ii.  location and extent of significant structures and impervious surfaces;
>> iii. rail cars and tracks;
>> iv.  location of all stormwater conveyances including ditches, pipes, and swales; and
>> v.   location and source of runoff from adjacent property containing significant quantities of pollutants and/or volume of concern to the facility.
> c.  <u>Required Updates</u>.  Part III.E of the current MSGP requires that the contents of the SWPPP are kept current.
> d.  <u>Inspections</u>.  Part III.C.7.b.(1).(a) of the current MSGP states that the SWPPP must describe routine inspections to evaluate conditions and maintenance needs of oil-water separators.  Part III.C.7.b.(2) of the current MSGP states that inspection frequencies shall be specified in the SWPPP.
> e.  <u>Impaired Waterbody</u>.  Part III.F.4 of the current MSGP requires the SWPPP to identify any impaired waterbody that may receive stormwater discharges associated with industrial activity from the Facility and a list of pollutants or pollutant parameters that have been handled, treated, stored, or disposed of in a manner that would create the potential for the pollutant of concern causing the impairment to be discharged.
> f.  <u>Record Retention</u>.  Part IV.E of the current MSGP states that records must be retained for at least five years from the date of the sample, measurement, report, or application.

100.    From October 14, 2014, to June 1, 2015, Defendants failed to include and/or adequately address the required contents of the Facility's SWPPP as described in Paragraph 99 and required by Part III of the current MSGP in the following ways:

   a.  Stormwater Flows.  During an October 2014 inspection of the Facility ("October 2014 Inspection"), EPA observed a portion of the Facility where stormwater discharges from the Facility and into the City of Rensselaer's sewer system.  Defendants failed to include this discharge flow path in the description of the Facility's stormwater flows as required by Part III.C.2 of the current MSGP.

   b.  Site Map.  Defendants failed to properly identify all of the items required by Part II.C.6 of the current MSGP.
      i.  The Facility site map depicts the property acreage as 45.57 acres; however, according to the text of the SWPPP and measurements conducted using aerial imagery, the Facility is located on 12 acres.
      ii.  Defendants failed to depict the location and extent of impervious surfaces as required by Part III.C.6.b of the current MSGP.
      iii.  Defendants failed to depict the rail cars and tracks observed by EPA during the October 2014 Inspection.
      iv.  During the October 2014 Inspection, EPA observed four catch basins to the west of the driveway, which are not depicted in the site map.  Therefore, Defendants failed to identify locations of all stormwater conveyances.
      v.  Defendants failed to depict the catch basins entering the Facility drainage system from neighboring Port of Albany property as required by Part III.C.6.l of the current MSGP.

   c.  Required Updates.  Defendants failed to update the Facility SWPPP in the following ways:
      i.  Section 4.4 of the Facility's SWPPP states that "all operations are performed within a single drainage basin. Storm water flows to catch basins that ultimately go to an Oil-Water Separator before discharging over rocks to the Hudson River."  However, the Facility operations along its driveway and maintenance garage discharge storm water runoff to a second drainage area that enters the City of Rensselaer's sewer system.
      ii.  Section 4.5 of the Facility's SWPPP states that the "[m]anagement of run-off is maintained by ensuring that all operations are performed in the designated process area and that stormwater does not leave the site except via the Oil-Water Separator . . . and/or over vegetated buffer zones."  However, four catch basins located at the Facility discharge directly to Outflow 001A without going through the oil-water separator, while four additional catch basins discharge into the City of Rensselaer's sewer system.

      iii.  Section 4.6 of the Facility's SWPPP states that "leaks or spills from inside the [maintenance] building would flow across the concrete floor and ultimately to the Oil-Water Separator."  However, runoff or spills from the maintenance garage would flow directly into catch basins which discharge into the City of Rensselaer's sewer system.

    d.  <u>Inspections</u>.  Defendants failed to specify in the Facility SWPPP how the oil-water separator will be inspected and maintained or at what frequency.  Defendants also failed to include in the Facility SWPPP a specific inspection frequency for the vehicle area inspections.

    e.  <u>Impaired Waterbody</u>.  Defendants failed to identify in the Facility SWPPP that the Hudson River is impaired due to PCBs and that the Facility has additional monitoring requirements.

    f.  <u>Record Retention</u>.  Defendants failed to include in the Facility SWPPP the correct amount of time for retaining records required by Part IV.E of the current MSGP.  Section 4.6 of the Facility's SWPPP states under *Inspection/Record Keeping* that "these records shall be retained for a minimum of one year."  Section 5.3 of the Facility's SWPPP states under *Record Keeping and Reporting* that "[r]ecords described in this SWPPP will be retained on site for 5 years from the date of the cover letter that notifies this facility of coverage under the storm water permit."

101.    As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**(Permit Violations for Improper SWPPP Implementation)**

102.    The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 101 as though fully set forth herein.

103.    Part III.A of the current MSGP and 2012 MSGP requires Defendants to implement the Facility's SWPPP provisions.

104.    Part VIII of the current MSGP lists sector-specific requirements in addition to the general requirements in the current MSGP.  Sector N requires the SWPPP to document considerations for "drums containing liquids, especially oil and lubricants, should be stored: indoors; in a bermed area; in overpack containers or spill pallets; or in similar containment

devices."  Section 4.1 of the Facility's SWPPP requires that "[a]ll fluid products and wastes are kept indoors" and "[w]aste oil is recycled and stored inside."

105.    During the October 2014 Inspection, EPA observed a waste oil tank outside in the vehicle dismantling area partially covered by a tarp.

106.    Part III.C.7.d of the current MSGP requires the SWPPP to describe how Defendants minimize potential "leaks, spills and other releases that may be exposed to stormwater and develop plans for effective response to such spills if or when they occur." Section 4.3 of the Facility's SWPPP states that "[o]il booms will be placed between the material and the dock during ship loading."

107.    During the October 2014 Inspection, EPA observed oil absorbent booms located along the edge of the dock with several spaces between booms where oil and oily water could flow into the Hudson River.

108.    Part III.C.7.b.(1).(a) of the current MSGP requires Defendants to evaluate the conditions and maintenance needs of stormwater management devices such as oil/water separators and catch basins "to avoid situations that may result in the practice becoming a source of *pollutants*."  (Emphasis in original.)  Section 4.4 of the Facility's SWPPP states that "[t]he Catch Basins have inserts that prevent major oil and debris from entering the OWS [Oil – Water Separator]."

109.    During the October 2014 Inspection, EPA observed a catch basin on-site that did not contain a filter fabric catch basin insert.  EPA also observed disturbed soil and a car muffler located adjacent to that catch basin.

110.    EPA also observed during the October 2014 Inspection that the catch basin inserts specified in the Amendments Section of the SWPPP and installed at the Facility were, according to the manufacturer, designed for the collection of trash and debris, not oil.

111.    Part III.C.7.b of the current MSGP and Part III.C.6.b.(1) of the 2012 MSGP require Defendants to perform regular inspections, and the Catch Basin Facility Inspection Forms contained in the Facility's SWPPP state that "[t]he Catch Basins are inspected regularly. The inserts are changed on a monthly basis at a minimum."  The Amendment Section of the Facility's SWPPP states that "[t]he inserts are change[d] monthly and after each major rain storm."

112.    According to the Catch Basin Facility Inspection Forms, "changed inserts date" is left blank on the records for the following 14 months: March 2012, January 2013, February 2013, April 2013, May 2013, June 2013, July 2013, August 2013, September 2013, November 2013, January 2014, February 2014, March 2014, and May 2014.

113.    Therefore, Defendants failed to change the inserts for the months described in Paragraph 112.

114.    Defendants also failed to change the inserts for the following 17 months: October 2009 through February 2012, April 2012 through December 2012, December 2013, August and September 2014.

115.    Therefore, Defendants failed to properly implement its SWPPP provisions as required by Part III.A of the current MSGP and 2012 MSGP.

116.    If Defendants conducted the monthly catch basin facility inspections described in Paragraphs 111 through 114, Plaintiff pleads in the alternative that Defendants failed to properly maintain monthly catch basin facility inspection forms for 31 months, specifically: October 2009

through February 2012, March 2012, April 2012 through December 2012, January 2013, February 2013, April 2013, May 2013, June 2013, July 2013, August 2013, September 2013, November 2013, December 2013, January 2014, February 2014, March 2014, May 2014, August and September 2014.

117.     As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

## FIFTH CLAIM FOR RELIEF
### (Permit Violations for Quarterly Visual Monitoring)

118.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 117 as though fully set forth herein.

119.     Part IV.B.1.a.(2) of the current MSGP and Part IV.A.1.a of the 2012 MSGP and 2007 MSGP require Defendants to conduct quarterly visual monitoring by collecting samples from discharges resulting from a storm event that is at least 0.1 inch of precipitation ("qualifying storm event") and samples must be taken within the first 30 minutes (or as soon thereafter as practical, but not to exceed one hour) of discharge.

120.     Part IV.B.1.a.(3) of the current MSGP and Part IV.A.1.a.(2) of the 2012 MSGP and 2007 MSGP excuse an owner or operator from performing visual monitoring when no qualifying storm event resulted in runoff from the facility during a monitoring quarter provided that "documentation is included with the monitoring records indicating that no qualifying storm event occurred that resulted in stormwater runoff during that quarter."

121.     Part IV.B.1.a.(8) of the current MSGP and Part IV.A.1.a.(4) of the 2012 MSGP and 2007 MSGP require Defendants to document and maintain on-site the Quarterly Visual Monitoring reports that include, among other things, the nature of the discharge and the visual quality of the stormwater discharge.

18

122.    Part IV.B.1.a.(7) of the current MSGP and Part IV.A.1.a.(2) of the 2012 MSGP and 2007 MSGP require all documentation to be signed and certified in accordance with Part V.H of the MSGPs (Signatory Requirements), which provides a certification statement to be included in all reports required by the MSGP.

123.    On at least 2 occasions, Defendants entirely failed to conduct quarterly visual monitoring for the quarters specified in Appendix A to this Complaint.

124.    On at least 16 occasions, Defendants failed to properly conduct quarterly visual monitoring in each of the quarters specified in Appendix A to this Complaint, as described therein.

125.    If Defendants conducted the quarterly visual monitoring described in Paragraph 123, Plaintiff pleads in the alternative that Defendants failed to maintain quarterly visual monitoring records for Quarter 4 of 2011 and Quarter 1 of 2014.

126.    As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

### SIXTH CLAIM FOR RELIEF
### (Permit Violations for Failure to Timely Submit Reports)

127.    The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 126 as though fully set forth herein.

128.    Part IV.D of the current MSGP contains a table of monitoring and reporting submission deadlines.  Facilities subject to the MSGP must submit reports for monitoring of discharges (Discharge Monitoring Reports) to impaired waterbodies – in this case, the Hudson River – and an annual certification report must be received by NYSDEC no later than February 28 of the year following the reporting period.

129.    Part IV.B.1.g.(6).(d) of the current MSGP requires that Defendants must report benchmark exceedance(s) and corrective action(s) on a Corrective Action Form "no later than 14 days after the end of the monitoring period in which the exceedance(s) occurred."

130.    NYSDEC received Defendants' late Discharge Monitoring Report for the reporting period ending on December 31, 2012, to the NYSDEC on August 8, 2013.

131.    NYSDEC belatedly received Defendants' late Annual Certification Report for 2012 to the NYSDEC on August 8, 2013.  NYSDEC belatedly received Defendants' late Corrective Action Form for reporting period ending on June 30, 2013, to the NYSDEC on September 12, 2013.

132.    NYSDEC belatedly received Defendants' late Corrective Action Form for the reporting period ending June 30, 2013, on or after July 22, 2014, the date listed on the form.

133.    NYSDEC belatedly received Defendants' late Corrective Action Form for reporting period ending December 31, 2014 to the NYSDEC, on or after March 15, 2015, the date listed on the form.

134.    Defendants failed to meet the deadlines specified in Part IV.D of the MSGP at least three times in 2013 and once in 2014.

135.    As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

### SEVENTH CLAIM FOR RELIEF
**(Permit Violations for Failure to Perform Annual Dry Weather Flow Monitoring)**

136.    The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 135 as though fully set forth herein.

137.    Part IV.B.1.b of the current MSGP and Part IV.A.1.b of the 2012 MSGP and 2007 MSGP require Defendants to perform annual dry weather flow monitoring.

138.     Defendants failed to perform annual dry weather flow monitoring for the years 2009-2013.

139.     If Defendants conducted the annual dry weather flow monitoring described in Paragraphs 137 and 138, Plaintiff pleads in the alternative that Defendants failed to maintain annual dry weather flow monitoring records for 2009, 2010, 2011, 2012, and 2013.

140.     As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

<strong><u>EIGHTH CLAIM FOR RELIEF</u></strong>
<strong>(Permit Violations for Failing to Adequately Respond to Benchmark Exceedances)</strong>

141.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 140 as though fully set forth herein.

142.     Part IV.B.1.c.(1) of the current MSGP and Part IV.A.1.c.(1) of the 2012 MSGP and 2007 MSGP require permittees to conduct annual benchmark monitoring of discharges associated with specific industrial activities.  Part VIII of the MSGPs provides benchmark monitoring parameters and cut-off concentrations for each sector.

143.     Part IV.B.1.c.(6) of the current MSGP and Part IV.A.1.c of the 2012 MSGP and 2007 MSGP require permittees to take corrective and follow-up actions when a benchmark sample exceeds a cut-off concentration and specifies that the owner or operator must, among other things, remedy problems identified at the facility, implement additional best management practices ("BMPs"), revise the facility's SWPPP, and collect an additional sample to determine the effectiveness of corrective actions.  Failure to undertake and document the necessary corrective actions constitutes a violation of the MSGPs.

144.     Benchmark samples exceeded benchmark cut-off concentrations on at least fourteen occasions over the relevant times alleged herein, as specified in Appendix B to this Complaint.

145.     Defendants failed to adequately respond to the exceedances described in Paragraph 144 and Appendix B to this Complaint by failing to properly document the necessary corrective actions.  The Defendants' Corrective Action Forms did not include the corrective actions, additional BMPs, SWPPP revisions, nor sampling results collected in addition to the routine benchmark monitoring.

146.     Defendants violated the MSGPs by failing to adequately document corrective actions, additional BMPs, SWPPP revisions, and additional sampling results.

147.     As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

**NINTH CLAIM FOR RELIEF**
**(Permit Violations for Training Failures)**

148.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 147 as though fully set forth herein.

149.     Pursuant to Part I.B.1.a.(2).(i) of the current MSGP and Parts VIII.M.4.b.(4) and VIII.P.2.c.(3) of the 2012 MSGP and 2007 MSGP, Defendants are required to annually train all employees responsible for implementing activities necessary to meet the conditions of the MSGPs.

150.     Defendants employ at least nine employees at the Facility who work in areas where industrial materials or activities are exposed to stormwater or who are responsible for implementing activities necessary to meet the conditions of the MSGPs.

151.     During the October 2014 Inspection, Defendants provided documents to EPA that indicated not all nine employees attended the training from 2009 to 2012.

152.     During the October 2014 Inspection, Defendants failed to produce to EPA any training logs or any records demonstrating employee annual training was conducted from 2009 through 2012.

153.     If Defendants conducted the employee training described in Paragraphs 151 through 152, Plaintiff pleads in the alternative that Defendants failed to properly maintain annual employee training logs from 2009 through 2012.

154.     As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

<u>TENTH CLAIM FOR RELIEF</u>
**(Permit Violations for Failure to Maintain Records)**

155.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 154 as though fully set forth herein.

156.     Part IV.E of the current MSGP and Part IV.C.2 of the 2012 MSGP and 2007 MSGP require permittees to retain monitoring records for at least five years.

157.     Defendants failed to maintain storm event data records for Quarter 4 in 2009, Quarters 1-4 of 2010, 2011, 2012, and 2013, Quarters 1-4 in 2014, and Quarters 1-2 in 2015.

158.     As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for injunctive relief and civil penalties for violating the terms and conditions of the permit.

<u>ELEVENTH CLAIM FOR RELIEF</u>
**(Permit Violations for Failure to Properly Collect Samples)**

159.     The United States realleges and incorporates by reference the facts and allegations of Paragraphs 1 through 158 as though fully set forth herein.

160.    Part IV.B.2.a.(2).b.(2) "Sample Analysis" of the current MSGP requires

monitoring and analysis must be conducted according to test procedures approved under 40

C.F.R. Part 136.

161.    40 C.F.R. Part 136 Table 1C specifies EPA Method 608 for PCB analysis.

162.    EPA Method 608 paragraph 9.2 states that all samples must be iced or refrigerated

at 4ºC from the time of collection until extraction.

163.    The lab report provided by Adirondack Environmental Services, Inc., the

Defendants' contract lab, for samples received by the lab from Defendants on 6/9/2015 stated

that samples for PCB analysis were received "outside the acceptable temperature range of 2-

6ºC."

164.    The lab report provided by Adirondack Environmental Services, Inc. for samples

received by the lab from Defendants on 12/02/2015 stated that samples for PCB analysis were

received "outside the acceptable temperature range of 2-6ºC."

165.    Defendants violated the current MSGP for their failure to properly provide

samples to its lab for testing within an acceptable temperature range.

166.    As alleged in Paragraphs 44 and 45, Defendants are liable to the United States for

injunctive relief and civil penalties for violating the terms and conditions of the permit.

## <u>RELIEF SOUGHT</u>

Wherefore, Plaintiff, the United States of America, respectfully requests that the Court

grant the following relief:

1.    Order Defendants to comply with all applicable requirements of the Clean Water

Act and its implementing regulations including the MSGP and any subsequent permits issued to

Defendants.

2.      Order Defendants to pay civil penalties not to exceed $37,500 per day per violation that occurred after January 12, 2009, and not to exceed $51,570 per day per violation that occurred after November 2, 2015.

3.      Award the United States all costs and disbursements of this action; and

4.      Grant such other relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division


Dated: September 9, 2016              s/ Bradley L. Levine
BRADLEY L. LEVINE
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
(202) 514-1513
bradley.levine@usdoj.gov
Bar Role No. 518985


Of Counsel:

LAUREN FISCHER
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway, 16th Floor
New York, New York 10007