## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 1:16-CV-1103 |
| | ) | (NAM/CHF) |
| | ) | |
| v. | ) | |
| | ) | __CONSENT DECREE__ |
| | ) | |
| | ) | |
| GRIMMEL INDUSTRIES, L.L.C., | ) | |
| RENSSELAER IRON & STEEL, INC., | ) | |
| and TOBY GRIMMEL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ....................................................................................... 1
II.     APPLICABILITY ........................................................................................................... 2
III.    DEFINITIONS ............................................................................................................... 2
IV.     DISMISSAL OF TOBY GRIMMEL ............................................................................. 4
V.      CIVIL PENALTY .......................................................................................................... 4
VI.     COMPLIANCE REQUIREMENTS .............................................................................. 4
VII.    REPORTING REQUIREMENTS .................................................................................. 6
VIII.   STIPULATED PENALTIES .......................................................................................... 7
IX.     FORCE MAJEURE ........................................................................................................ 9
X.      DISPUTE RESOLUTION ............................................................................................ 10
XI.     INFORMATION COLLECTION AND RETENTION ................................................ 11
XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ..................................... 13
XIII.   COSTS .......................................................................................................................... 13
XIV.    NOTICES ...................................................................................................................... 14
XV.     EFFECTIVE DATE ...................................................................................................... 15
XVI.    RETENTION OF JURISDICTION .............................................................................. 15
XVII.   MODIFICATION ......................................................................................................... 16
XVIII.  TERMINATION ........................................................................................................... 16
XIX.    PUBLIC PARTICIPATION ......................................................................................... 16
XX.     SIGNATORIES/SERVICE .......................................................................................... 17
XXI.    INTEGRATION ........................................................................................................... 17
XXII.   FINAL JUDGEMENT .................................................................................................. 17
XXIII.  APPENDICES .............................................................................................................. 17
XXIV.   26 U.S.C. SECTION 126(f)(2)(A)(ii) IDENTIFICATION ........................................ 18

WHEREAS, Plaintiff United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed this action against Grimmel Industries, LLC., Rensselaer Iron & Steel, Inc., and Toby Grimmel (collectively, "Defendants"), pursuant to Section 309(d) of the Clean Water Act (the "Act"), 33 U.S.C. § 1319(d), alleging that the Defendants violated permits issued by the State of New York pursuant to Section 402 of the Act, 33 U.S.C. § 1342, governing stormwater discharges from their facility located in Rensselaer, New York ("Facility");

WHEREAS, the United States has entered into this Consent Decree to resolve the issues raised by the EPA regarding Defendants' compliance with Section 402 of the Act , 33 U.S.C. § 1342, and implementing regulations, including the issues raised in the Complaint in this action and the Additional Claims, as defined in Section III;

WHEREAS, as set forth below, upon entry of this Consent Decree by the Court, Toby Grimmel will be dismissed as a Defendant in this matter in accordance with the terms set forth in Section IV below;

WHEREAS, EPA acknowledges Defendants' efforts, including the commitment of significant financial and human resources, to comply with the applicable laws and regulations;

WHEREAS, because Defendants have been and remain committed to working with governmental agencies in assuring the protection and preservation of the environment, Defendants agree to implement additional measures, as reflected by the Consent Decree;

WHEREAS, Defendants do not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint, and this Consent Decree shall not be construed as proof of any allegations in the Complaint of wrongdoing under the Clean Water Act;

WHEREAS the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest; and

WHEREAS, the Parties are confident they can and will work cooperatively on the implementation of the Consent Decree and on regulatory matters in the future;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.     JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the Act, 33 U.S.C. § 1319(b), and over

the Parties.  Venue lies in this District pursuant to 33 U.S.C. § 1319(b), 28 U.S.C. §§ 1391(b) or (c), and/or 1395(a).  For purposes of this Decree, or any action to enforce this Decree, Settling Defendants consent to the Court's jurisdiction over this Decree and any such action and over Settling Defendants, and consent to venue in this judicial district.

2. For purposes of this Consent Decree only, Settling Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Sections 309(b) and (d), 311(b)(7), and 402 of the Act, 33 U.S.C. §§ 1319(b) and (d), 1321(b)(7), and 1342.

## II.     APPLICABILITY

3. The obligations of this Consent Decree apply to and are binding upon the United States and upon Settling Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

4. No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Settling Defendants of their obligation to ensure that the terms of the Decree are implemented.  At least 30 days prior to such transfer during the term of this Consent Decree, Settling Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA and the United States Department of Justice, in accordance with Section XIV of this Decree (Notices). Any attempt to transfer ownership or operation of the Facility during the term of this Consent Decree without complying with this Paragraph constitutes a violation of this Decree.

5. Settling Defendants shall provide a copy of this Consent Decree to all officers employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree.  Settling Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6. In any action to enforce this Consent Decree, Settling Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.     DEFINITIONS

7. Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Additional Claims" shall mean the following claims identified by the United States after filing the Complaint: that the Defendants failed to monitor the discharges from the major outfall at the

Facility for a period of time up to on or about October 14, 2014, that Defendants failed to notify the New York State Department of Environmental Conservation or EPA that they had failed to sample from the major outfall during this period of time, that scrap metal fell into the Hudson River through an approximately 6" separation between the two sections of the pier during ship loading operations at some point in time before a metal plate was placed over the separation and that such scrap metal remains in a pile located in the river under the pier, and other alleged deficiencies in the 2018 SWPPP that are identified in Appendix A;

"Best Management Practices" or "BMPs" shall mean stormwater best management practices, as required to be implemented, inspected, maintained, and/or replaced under the New York MSGP;

"Complaint" shall mean the complaint filed by the United States in this action;

"Consent Decree" or "Decree" shall mean this Decree and all Appendices attached hereto listed in Section XXIII;

"Date of Lodging" shall mean the date the Decree is lodged with the Court;

"Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

"Effective Date" shall have the definition provided in Section XV;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Facility" shall mean the metal recycling facility at 35 Riverside Avenue, Rensselaer, New York;

"New York MSGP" shall mean the State Pollutant Discharge Elimination System ("SPDES") Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (GP-0-17-004) issued by the New York State Department of Environmental Conservation on March 1, 2018, as well as any subsequent MSGP(s) issued by the New York State Department of Environmental Conservation or its successors during the term of this Decree;

"Paragraph" or "¶" shall mean a portion of this Decree identified by an arabic numeral;

"Parties" shall mean the United States and Defendants;

"Section" shall mean a portion of this Decree identified by a roman numeral;

"Settling Defendants" shall mean Grimmel Industries, L.L.C. and Rensselaer Iron & Steel, Inc.;

"Stormwater Pollution Prevention Plan" or "SWPPP" shall mean the stormwater pollution prevention plan as required to be developed, implemented, inspected, maintained, reviewed, revised, and/or replaced under the MSGP for the Facility; and

"United States" shall mean the United States of America, acting on behalf of and including EPA and any successor departments, agencies, or instrumentalities of the United States.

## IV.    DISMISSAL OF TOBY GRIMMEL

8.    In accordance with Federal Rule of Civil Procedure 41(a)(1)(ii), the United States and Defendants stipulate, and this Court agrees, to the dismissal of Defendant Toby Grimmel without prejudice.  However, Toby Grimmel shall be entitled to the benefits of the covenant not to sue, as provided in Paragraph 56, subject to the provisions of Paragraphs 57–59.

## V.    CIVIL PENALTY

9. Within 60 Days after the Effective Date of this Consent Decree, Settling Defendants shall pay the sum of $100,000 as a civil penalty, together with interest accruing from the Effective Date, at the rate specified in 28 U.S.C. § 1961 as of the Effective Date.  Settling Defendants are jointly and severally liable for the payment of the Civil Penalty.

10. Settling Defendants shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Settling Defendants, following the Effective Date of the Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the Northern District of New York.  At the time of payment, Settling Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Grimmel Industries, LLC, et al., and shall reference the DOJ case number 90-5-1-1-11209, to the United States and EPA in accordance with Section XIV of this Decree (Notices); by email to acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio  45268

11. Settling Defendants shall not deduct any penalties paid under this Decree pursuant to this Section or Section VIII (Stipulated Penalties) in calculating their federal income taxes.

## VI.    COMPLIANCE REQUIREMENTS

12. Settling Defendants shall comply with all applicable requirements of statutes, regulations, permits, or other legal requirements alleged to have been violated in the Complaint with respect to the Facility.

13. Within 30 Days of the Effective Date, Settling Defendants shall provide EPA with a copy of a revised SWPPP that is consistent with the requirements of Appendix A.

14. Within 180 Days of the Effective Date, Settling Defendants shall submit to EPA documentation (including photographs) concerning the following:

       a.     the source of drainage from the Facility connected to the concrete pipe under the pier that was identified by the United States at the Facility on June 14, 2018;

       b.     the source of drainage from the Facility connected to the 12" pipe that discharges into the Hudson River near the southern border of the Facility; and

       c.     the downstream connections and discharge point from the catch basins alongside the driveway and road from the Facility to either the Rensselaer Sewer District #1 or the municipal separate storm sewer system of the City of Rensselaer; and

       d.     a revised SWPPP to EPA, as necessary, based upon the findings in Paragraph 14.a-c.

15. Settling Defendants shall implement the SWPPP consistent with any revisions required by Paragraphs 13 and 14.

16. Within 180 Days of the Effective Date, Settling Defendants shall remove all scrap debris under the pier that was identified by the United States at the Facility on June 14, 2018.

17. Within 180 Days of the Effective Date, Settling Defendants shall install a berm along the eastern boundary of the Facility at the location shown on the map attached hereto as Appendix B to prevent future migration of debris and stormwater to the neighboring property.

18. Within 180 Days of the Effective Date, Settling Defendants shall inspect and ensure the control measures along the pier and in and around catch basins are in effective operating condition.

19. Within 180 Days of the Effective Date, Settling Defendants shall eliminate stormwater discharges from the catch basin located under the material storage pile utilizing either a temporary or permanent seal. In the event of a temporary seal, Settling Defendants shall inspect and maintain it as a BMP in accordance with the manufacturer's instructions and as required by the MSGP and shall update the SWPPP accordingly.

20. Permits. Where any compliance obligation under this Section requires Settling Defendants to obtain a federal, state, or local permit or approval, Settling Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Settling Defendants may seek relief under the provisions of Section IX of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Settling Defendants have submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VII.    REPORTING REQUIREMENTS

21. Settling Defendants shall submit the following reports during the term of this Consent Decree:

a.    By January 31 and July 31 of each calendar-year after the Date of Lodging, until termination of this Decree pursuant to Section XVIII, Settling Defendants shall submit by email to EPA a semi-annual report for the preceding six-month period that shall include visual monitoring results, copies of any discharge monitoring reports for benchmark monitoring and effluent monitoring, and any corrective action documentation required by the MSGP to be retained by the Settling Defendants.

b.    Within 2 weeks of completion of any measure required by Paragraphs 14–19, Settling Defendants shall notify EPA of the completion of such measure(s) and submit documentation, including but not limited to photographs, demonstrating compliance with the Decree in accordance with Section XIV (Notices) of this Decree.

22. If Settling Defendants violate, or have reason to believe that they may violate, any requirement of this Consent Decree, Settling Defendants shall notify the United States of such violation and its likely duration, in writing, within 10 business Days of the Day Settling Defendants first become aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Settling Defendants shall so state in the report.  Settling Defendants shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Settling Defendants become aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Settling Defendants of their obligation to provide the notice required by Section IX of this Consent Decree (Force Majeure).

23. Whenever any violation of this Consent Decree or of the New York MSGP or any other event affecting Settling Defendants' performance under this Decree, may pose an immediate threat to the public health or welfare or the environment, Settling Defendants shall notify EPA orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Settling Defendants first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph and any notification required by any federal, state, or local statute, law, or regulation.

24. Each report submitted by Settling Defendants under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the

information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

25. The reporting requirements of this Consent Decree do not relieve Settling Defendants of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

26. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII. STIPULATED PENALTIES

27. Settling Defendants shall be jointly and severally liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section IX (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

28. Late Payment of Civil Penalty: If Settling Defendants fail to pay the civil penalty required to be paid under Section V of this Decree (Civil Penalty) when due, Settling Defendants shall pay a stipulated penalty of $4,000 per Day for each Day that the payment is late.

29. Compliance Milestones: The following stipulated penalties shall accrue per violation per Day for each violation of the deadlines identified in Paragraphs 13–19:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,250 | 15th through 30th Day |
| $1,750 | 31st Day and beyond |

30. <u>Reporting Requirements</u>. The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VII of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $300 | 1st through 14th Day |
| $500 | 15th through 30th Day |
| $1,000 | 31st Day and beyond |

31. Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

32. Settling Defendants shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

33. The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

34. Stipulated penalties shall continue to accrue as provided in Paragraph 31, during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Settling Defendants shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.      If the dispute is appealed to the Court and the United States prevails in whole or in part, Settling Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.      If any Party appeals the District Court's decision, Settling Defendants shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

35. Settling Defendants shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

36. If Settling Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Settling Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this

Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Settling Defendants' failure to pay any stipulated penalties.

37. Subject to the provisions of Section XII of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for Settling Defendants' violation of this Consent Decree or applicable law.

## IX.     FORCE MAJEURE

38. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Settling Defendants, of any entity controlled by Settling Defendants, or of Settling Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Settling Defendants' best efforts to fulfill the obligation. The requirement that Settling Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. Force Majeure does not include Settling Defendants' financial inability to perform any obligation under this Consent Decree.

39. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by Force Majeure, Settling Defendants shall provide notice orally or by electronic or facsimile transmission to EPA within 72 hours of when Settling Defendants first knew that the event might cause a delay. Within 7 days thereafter, Settling Defendants shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Defendants' rationale for attributing such delay to Force Majeure if it intends to assert such a claim; and a statement as to whether, in the opinion of Settling Defendants, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Settling Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to Force Majeure. Failure to comply with the above requirements shall preclude Settling Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Settling Defendants shall be deemed to know of any circumstance of which Settling Defendants, any entity controlled by Settling Defendants, or Settling Defendants' contractors knew or should have known.

40. If EPA agrees that the delay or anticipated delay is attributable to Force Majeure, the time for performance of the obligations under this Consent Decree that are affected by Force Majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by Force Majeure shall not, of itself, extend the time for performance of any other obligation. EPA will

notify Settling Defendants in writing of the length of the extension, if any, for performance of the obligations affected by Force Majeure.

41. If EPA does not agree that the delay or anticipated delay has been or will be caused by Force Majeure, EPA will notify Settling Defendants in writing of its decision.

42. If Settling Defendants elect to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Settling Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by Force Majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Settling Defendants complied with the requirements of Paragraphs 38 and 39, above. If Settling Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Settling Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

## X. DISPUTE RESOLUTION

43. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

44. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Settling Defendants send the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 20 Days after the conclusion of the informal negotiation period, Settling Defendants invoke formal dispute resolution procedures as set forth below.

45. Formal Dispute Resolution. Settling Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Settling Defendants' position and any supporting documentation relied upon by Settling Defendants.

46. The United States shall serve its Statement of Position within 45 Days of receipt of Settling Defendants' Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Settling Defendants, unless Settling Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

47. Settling Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 10 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Settling Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

48. The United States shall respond to Settling Defendants' motion within the time period allowed by the Local Rules of this Court. Settling Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

49. <u>Standard of Review</u>

    a. <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 45 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Settling Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

    b. <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 45, Settling Defendants shall bear the burden of demonstrating that their position complies with this Consent Decree and better furthers the objectives of the Consent Decree by a preponderance of the evidence.

50. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Settling Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 34. If Settling Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.     INFORMATION COLLECTION AND RETENTION

51. The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

      a.      monitor the progress of activities required under this Consent Decree;

      b.      verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

      c.      obtain samples and, upon request, splits of any samples taken by Settling Defendants or their representatives, contractors, or consultants;

      d.      obtain documentary evidence, including photographs and similar data; and

      e.      assess Settling Defendants' compliance with this Consent Decree.

52. Upon request, Settling Defendants shall provide EPA, or its authorized representatives, splits of any samples taken by Settling Defendants or their consultant. Upon request, EPA shall provide Settling Defendants or the consultant splits of any samples taken by EPA.

53. Until five years after the termination of this Consent Decree, Settling Defendants shall retain, and shall instruct their consultant, contractors, and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their consultant's, contractors', or agents' possession or control, or that come into their or their consultant's, contractors', or agents' possession or control, and that relate in any manner to Settling Defendants' performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Settling Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

54. Settling Defendants may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Settling Defendants seeks to protect as CBI, Settling Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

55. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Settling Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

56. This Consent Decree resolves the civil claims of the United States against the Defendants for the violations alleged in the Complaint filed in this action and for the Additional Claims through the Date of Lodging.

57. The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 56. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 56.

58. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility or Defendants' violations, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 56 of this Section.

59. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Settling Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Settling Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Settling Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 33 U.S.C. § 1251 *et seq.*, or with any other provisions of federal, State, or local laws, regulations, or permits.

60. This Consent Decree does not limit or affect the rights of Defendants or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

61. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.    COSTS

62. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Settling Defendants.

## XIV.   NOTICES

63. Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>To the United States</u>:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611
Re: DOJ No. 90-5-1-1-11209
Eescdcopy.enrd@usdoj.gov

and

<u>To EPA</u>:
Chief, Water Compliance Branch
Division of Enforcement and Compliance Assistance
U.S. Environmental Protection Agency,
Region II
290 Broadway, 20th Floor
New York City, NY  10007-1866
Phone: (212) 637-4244
mckenna.douglas@epa.gov
mceathron.kimberly@epa.gov

Chief, Water and General Law Branch
Office of Regional Counsel
U.S. Environmental Protection Agency,
Region II
290 Broadway, 16th Floor
New York City, NY  10007-1866
Phone: (212) 637-3232
feinmark.phyllis@epa.gov
fischer.lauren@epa.gov

<u>To Settling Defendants</u>:

Rensselaer Iron & Steel, Inc.
35 Riverside Avenue
Rensselaer, NY
Phone: (518) 465-1484

*With copies to:*

Whiteman Osterman & Hanna, LLP
One Commerce Plaza
Albany, NY  12260
Attn:  Michael G. Sterthous
Phone: (518) 487-7600
msterthous@woh.com

and

Donald L. Anglehart
Law Office of Donald L. Anglehart, LLC
One Broadway, 14th Floor
Cambridge, MA 02142
Phone: (617) 943-2325
danglehart@anglehart.com

64. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

65. Where an email address is provided, notices submitted pursuant to this Section shall be deemed submitted upon emailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.   EFFECTIVE DATE

66. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.   RETENTION OF JURISDICTION

67. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Decree.

## XVII.  MODIFICATION

68. The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

69. Any disputes concerning modification of this Decree shall be resolved pursuant to Section X of this Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 49, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

70. After Settling Defendants have completed the requirements of Paragraphs 13 to 19 of this Decree, have thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of 12 months, have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, and have submitted signed certificate of compliance with this Decree and the Act, Settling Defendants may serve upon the United States a Request for Termination, stating that Settling Defendants have satisfied these requirements, together with all necessary supporting documentation.

71. Following receipt by the United States of Settling Defendants' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Settling Defendants have satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

72. If the United States does not agree that the Decree may be terminated, Settling Defendants may invoke Dispute Resolution under Section X of this Decree.  However, Settling Defendants shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 45 of Section X, until 60 Days after service of its Request for Termination.

## XIX.  PUBLIC PARTICIPATION

73. This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the

Court or to challenge any provision of the Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Decree.

## XX.   SIGNATORIES/SERVICE

74. Each undersigned representative of Defendants and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

75. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXI.   INTEGRATION

76. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXII.   FINAL JUDGEMENT

77. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Federal Rules of Civil Procedure 54 and 58.

## XXIII. APPENDICES

78. The following Appendices are attached to and incorporated into this CD:

"Appendix A" summarizes the deficiencies in Settling Defendants' 2018 SWPPP as alleged by EPA, Settling Defendants' comments to those deficiencies, and EPA's subsequent responses to Settling Defendants' comments.  Where EPA has not made further Response, Settling Defendants' Comments are deemed acceptable.

"Appendix B" is a map of the Rensselaer facility identifying the location of the berm to be constructed as required by Paragraph 17.

## XXIV. <u>26 U.S.C. SECTION 126(f)(2)(A)(ii) IDENTIFICATION</u>

79. For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability) Paragraph 5; Section VI (Compliance Requirements) Paragraphs 12–19; Section VII (Reporting Requirements) Paragraphs 21 and 23; and Section XI (Information Collection and Retention) Paragraphs 51–53, is restitution or required to come into compliance with law.

**SO ORDERED, ADJUDGED, AND DECREED:**

Dated and entered this __18th__ day of __March__, 2019

_Norman A. Mordue_
Norman A. Mordue
Senior U.S. District Judge

**FOR THE UNITED STATES OF AMERICA:**

12/4/18
Date

ELLEN M. MAHAN
Deputy Section Chief
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section


12/4/18
Date

DONALD G. FRANKEL
NATALIE G. HARRISON
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
Washington, DC 20044-7611

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

11/9/18
Date

ERIC SCHAAF
Regional Counsel
U.S. Environmental Protection Agency, Region II
290 Broadway, 17th Floor
New York City, NY  10007-1866

OF COUNSEL:

LAUREN FISCHER
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region II
Office of Regional Counsel
290 Broadway, 16th Floor
New York City, NY  10007-1866

**FOR**
**GRIMMEL INDUSTRIES, LLC.:**

_____
11.2.18
Date

**FOR RENSSELAER IRON & STEEL, INC.:**

_11 - 2 - 18_
Date

**FOR TOBY GRIMMEL:**

11/2/18
Date

**APPENDIX A: IDENTIFIED CONCERNS TO FACILITY'S 2018 SWPPP, SETTLING DEFENDANTS' COMMENTS, AND EPA RESPONSES**

Part II.D.1.a.(1) of the 2018 MSGP requires the owner or operator to develop and implement a Stormwater Pollution Prevention Plan (SWPPP), in accordance with the requirements in Part III of the 2018 MSGP. EPA identified certain inadequacies regarding the Facility's 2018 SWPPP, and Settling Defendants provided the following Comments. Unless otherwise noted below by EPA's Response(s), the Parties agree that the changes required by Settling Defendants' Comments below will be made to the Facility's 2018 SWPPP. Where EPA has provided a Response, Settling Defendants will make changes in accordance with such Response(s). Where EPA has not made further Response, Settling Defendants' Comments are deemed acceptable:

a. The Facility's 2018 SWPPP does not include the following elements required by the 2018 MSGP:

    i. Identification of the Municipal Separate Storm Sewer System ("MS4") operator and the receiving water to which the MS4 discharges, as required by Part III.A.2.c of the 2018 MSGP;

    <u>Settling Defendants' Comment:</u> Based on a review of the City of Rensselaer stormwater and sewer maps, the SWPPP will be updated to reflect that certain catch basins located on the facility access road connect to the City's MS4 which discharges to the Hudson River via an outfall north of the facility, as shown on the noted maps.

    ii. The flow path of stormwater within the Facility, and the general path of stormwater flows between the Facility and the nearest surface waterbody(ies) and/or location(s) where stormwater enters an MS4, as required by Part III.A.2.d of the 2018 MSGP. In June 2018, EPA identified the following stormwater flows were not included in the 2018 SWPPP:

        1. A metal drainage pipe and perforated corrugated plastic pipe extending from the south side of the railroad tracks to the Hudson River, previously identified as Outfall 001A in the Facility's SWPPP from the 2014 CEI;

        <u>Settling Defendants' Comment:</u> Field visits during or directly after recent rain events (September 10, 2018, September 21, 2018, and October 1, 2018) revealed that these two pipes were dry with no obvious flow. It appears that these pipes are remnant of some previous site usage from years ago and do not appear to be outfalls connected to the RIS site drainage system. The black corrugated pipe can be removed from the metal pipe and both pipes temporarily capped to further confirm their status as part of the consent decree. No further update to the SWPPP is required at this point.

        2. Drainage structures along the south side of the railroad tracks, including but not limited to a corrugated perforated plastic pipe and a metal outfall pipe;

> Settling Defendants' Comment: These appear to be the same pipes discussed in Item a.ii.1. No further update to the SWPPP is required at this point.

3. A broken metal pipe under the dock extending from land;

> Settling Defendants' Comment: This pipe appears to be obsolete and not an outfall connected to the RIS site drainage system. This was confirmed on the noted field visits where the pipe was dry with no obvious flow. RIS has inquired of the Port of Albany for further insight on this pipe. No further update to the SWPPP is required.

4. A concrete pipe under the dock extending from land; and

> Settling Defendants' Comment: This pipe is not shown on the site drainage plans that have been incorporated into the facility's SWPPP and it is believed not to be connected to the facility's storm water collection system. A recent site visit during a rain event (September 10, 2018) revealed a very minor amount of flow draining from the pipe. However, on a second visit on September 21, 2018, the pipe was completely submerged either by the tide and/or high water related to rains from Hurricane Florence. As a result, it is possible that the previously noted flow from this pipe is river water which infiltrates the pipe at high water and not stormwater draining from the site. Therefore, it remains uncertain whether this pipe is an active outfall from the RIS facility. RIS has inquired of the Port of Albany for further insight on this pipe. This pipe will be further assessed as part of the consent decree. No further update to the SWPPP is required at this time.

5. Drainage to the east of the Site.

> Settling Defendants' Comment: The area to the east of the site along the chain link fence and near the electric sorter is extremely flat. This area was recently inspected during a rain event and there was no evidence of flow draining offsite to the adjacent parcel. The area along the southeast corner of the property, as shown in the referenced pictures and depicted as a red highlighted area on the VHB drainage plan map as modified by EPA/DOJ, was recently inspected during a rain event (September 10, 2018) and there was no obvious flow draining offsite to the adjacent parcel. There is an existing berm in this area that appears to be adequately containing any stormwater flow from this area. The condition and effectiveness of the existing berm and the potential need to expand it will be assessed as part of the consent decree. No update to SWPPP is required at this time.

> EPA Response: EPA is concerned about the drainage flow described above, but agrees that upon completion of the berm required by Paragraph 17 of the Decree, that the flow described herein will be accurate.

iii. An estimate of the percent imperviousness of the Site, as required by Part III.A.2.h of the MSGP. The 2018 SWPPP did not include a percent imperviousness and the total estimates of land area type provided in the SWPPP do not add up to the total

leased acres of land. The 2018 SWPPP states that 15.8 acres are leased and that 8.5 acres are unpaved, compacted soil, 0.9 acres of grassed area and about 0.9 acres of railroad tracks (which adds up to 16.7 acres);

<u>Settling Defendants' Comment:</u> The percent imperviousness is approximately 40%. The amount of leased area comprising the facility is 15.8 acres. The current SWPPP inadvertently added 0.9 acres of grassed area which was already included in the 8.5 acres of unpaved area. Therefore, the areas shown on the SWPPP are correct. The SWPPP text will be updated accordingly.

iv.  The location and type of BMPs installed and implemented at the Facility to achieve the non-numeric effluent limits in Part II.A and where applicable in Part VII, and the sector specific numeric effluent limitations in Part VII of the 2018 MSGP. The 2018 SWPPP does not include specifics regarding the use of hay bales as a BMP. In June 2018, EPA observed hay bales in use as a control practice around at least two (2) catch basins (CB #1 and 3).

<u>Settling Defendants' Comment:</u> The hay bales served as a secondary redundant BMP to the grit bag insert in the catch basin. They were not referenced on the SWPPP because it is impractical to be consistent with the NYSDEC standard of staking them into the underlying pavement to serve as a primary BMP. The hay bales will be removed and no longer used.

v.  Documentation considering the following BMPs, as required by Part VII Sector M of the MSGP:
   1.  Vehicle draining and dismantling activities must be conducted in a bermed area, constructed of concrete or other surfaces that allows equivalent protection to groundwater; and
   2.  The dismantling area should also be covered.

<u>Settling Defendants' Comment:</u> Implementing such measures is not technologically possible, economically practicable and achievable or likely to have a measurable effect on further minimizing pollutant discharges. Documentation of benchmark monitoring results for the primary parameters of concern for this activity (e.g. oil & grease and BTEX compounds) over the last 6-7 years were either below detection levels or well below the benchmark threshold. The same is true for TSS over the last 4 years. The SWPPP narrative will be updated to reference the BMP as not appropriate or necessary.

vi.  Documentation considering the following BMPs, as required by Part VII Sector N of the 2018 MSGP:
   1.  Store the equivalent of one day's volume of recyclable materials indoors;

<u>Settling Defendants' Comment:</u> Storing one-day's volume of material received indoors is not technologically possible given the amount of material received each day. The processed and sorted material is also not shipped out each day. The SWPPP

narrative will be updated to reference the BMP as not appropriate or necessary.

2. Permanent or semi-permanent covers over areas where materials are transferred, stored or stockpiled;

Settling Defendants' Comment: See response to item a.vi.1 above. Outdoor storage of materials is consistent with the storage practices in the adjacent industrial land uses on both sides of the river. The SWPPP narrative will be updated to reference the BMP as not appropriate or necessary.

3. Provide stormwater containment within a 30-foot perimeter of the following fixed equipment: shears, balers, shredders, grinders, screeners and conveyors;

Settling Defendants' Comment: Implementing such measures is not technologically possible, economically practicable and achievable or likely to have a measurable effect on further minimizing pollutant discharges. Documentation of benchmark monitoring results for the primary parameters of concern for this activity (e.g. oil & grease and BTEX compounds) over the last 6-7 years were either below detection levels or well below the benchmark threshold. The same is true for TSS over the last 4 years. The suggested containment would also seem to provide minimal benefit as stormwater that might collect within the bermed area would need to be released and likely end up in same location. The SWPPP narrative will be updated to reference the BMP as not appropriate or necessary.

4. Use and maintenance of silt and/or other fencing around shredder fluff or other light material processing to prevent migration by wind and stormwater runoff.

Settling Defendants' Comment: The shredder fluff is primarily stored on concrete pads where it would be impracticable to install silt fence or other fencing. The SWPPP narrative will be updated to reference the BMP as not appropriate.

vii. Documentation considering covering the vehicle fueling area, as required by Part VII Sector P of the 2018 MSGP.

Settling Defendants' Comment: Covering the vehicle fueling area is not technologically possible, economically practicable and achievable or likely to have a measurable effect on further minimizing pollutant discharges. Documentation of benchmark monitoring for the primary parameters of concern for this activity (e.g. oil & grease and BTEX compounds) over the last 6-7 years were either below detection levels or well below the benchmark threshold. The same is true for TSS over the last 4 years. The SWPPP narrative will be updated to reference the BMP as not appropriate or necessary.

viii. The 2018 SWPPP does not specify the requirement for reporting spills to the NYSDEC within two hours of discovery, as required by Part VII Sector M of the 2018 MSGP.

> Settling Defendants' Comment: The SWPPP will be updated to include the phrase "within two hours of discovery" as part of the spill reporting requirements. The remaining SWPPP text is consistent with NYSDEC regulations.

ix. Part II.A.8.d of the 2018 MSGP requires personnel to be trained in the following subjects: the purpose of the SWPPP; how to recognize unauthorized discharges; proper sampling procedures; when and how to take corrective actions. The training procedures and documentation provided in the 2018 SWPPP does not incorporate these specific subjects.

> Settling Defendants' Comment: The training section of the SWPPP will be updated to expressly reference these topics.

x. BMPs designed to eliminate unauthorized non-stormwater discharges, specifically from the shredder spraying operations and driveway dust control spray water.

> Settling Defendants' Comment: The water use for these operations is very limited. Excess water (non-stormwater discharge) from these operations has not been observed at the outfall during past routine inspections.

b. The Facility's 2018 SWPPP site map does not depict or accurately depict the following elements required by Part III.A.6 of the 2018 MSGP:

i. Location of each outfall labeled with the outfall identification, as required by Part III.A.6.c of the 2018 MSGP. EPA identified potentially additional outfalls whose locations were not depicted on the 2018 SWPPP site map, including the 12-inch metal drainage pipe from the railroad tracks to the Hudson River, the driveway to the MS4, east of the property to the MS4, and two (2) additional pipes under the dock.

> Settling Defendants' Comment: These additional pipes are not considered direct outfalls from the facility. See responses to item a.ii.1-4 above. The SWPPP figures show the only known active outfall associated with site stormwater drainage system, which is labeled Outfall 001. The SWPPP will be updated to reflect the City of Rensselaer MS4.

> EPA Response: Paragraph 14 of the Decree requires that Settling Defendants revise the SWPPP based upon findings in Paragraph 14.

ii. The approximate outline of the drainage area to each outfall, as required by Part III.A.6.d of the 2018 MSGP. The outline of the drainage area east of the property and along the railroad tracks south were not depicted in the 2018 SWPPP.

> Settling Defendants' Comment: Drainage area outlines are depicted on the SWPPP figures and site plan for relevant outfalls on the site. The area around the railroad tracks and the easterly edge of the site is essentially flat and observations during a rain event showed no clear evidence or indication of flow direction to any outfall.

5

Therefore, updates to the SWPPP for additional drainage area flow to identified outfalls does not appear warranted.

iii.  Arrows showing direction of stormwater flow, as required by Part III.A.6.g of the 2018 MSGP. Arrows showing the direction of flow to the east of the Site and the railroad tracks south were not depicted in the 2018 SWPPP site map.

Settling Defendants' Comment: Flow area outlines, and directional arrows are depicted on the SWPPP figures and site plan for relevant areas of the site. The area around the railroad tracks and the easterly edge of the site is essentially flat and observations during a rain event showed no clear evidence or indication of flow direction. Therefore, updates to the SWPPP for additional known drainage area flows does not appear warranted.

iv.  Location of MS4s and where the stormwater discharges to them, as required by Part III.A.6.i of the 2018 MSGP. The 2018 SWPPP site map doesn't depict the street drainage as an MS4.

Settling Defendants' Comment: The SWPPP will be updated to relabel the offsite street drainage as part of the City of Rensselaer MS4 that discharges to the Hudson River.

v.  Location of all stormwater conveyances including ditches, pipes, and swales, as required by Part III.A.6.j of the 2018 MSGP. The 2018 SWPPP site map does not depict the following stormwater conveyances observed by EPA in June 2018:
1.  A metal drainage pipe and perforated corrugated plastic pipe extending from the south side of the railroad tracks to the Hudson River;
2.  Drainage structures along the south side of the railroad tracks, including but not limited to a corrugated perforated plastic pipe and a metal outfall pipe;
3.  A broken metal pipe under the dock extending from land;
4.  A concrete pipe under the dock extending from land; and
5.  Drainage to the east of the Site.

Settling Defendants' Comment: See Response to a.ii.1-5 above.

vi.  A labelled vehicle dismantling area, as required by Part VII for Sector M of the 2018 MSGP.

Settling Defendants' Comment: The SWPPP narrative and figure will be updated to include the label "vehicle dismantling area" which is the same location as the "vehicle draining area."

vii.  The Site Map depicts the Vehicle Oil Drainage Area as being partially located on unpaved surface while the 2018 SWPPP narrative specifies the location as being paved, as required by Sector M the 2018 MSGP to prevent groundwater contamination.

Settling Defendants' Comment: The map outline indicating the vehicle draining area may have inadvertently extended off the paved area and will be corrected to better show the limits as fully on the paved area, consistent with the SWPPP narrative.

c.  Part III.A.7.i.(4) of the MSGP states that the SWPPP must contain adequate details to demonstrate that controls conform to the New York Standards and Specifications for Erosion and Sediment Control (2016), or equivalent. The filter fabric catch basin inserts, unstaked hay bales and oil absorbent booms along the dock observed in use on-site at the time of the Site Visit are not being utilized consistent with the New York Standards and Specifications for Erosion and Sediment Controls (2016) and their equivalency is not demonstrated in the 2018 SWPPP. For instance, the standards specify that the hay bales shall be staked into the ground, however, EPA observed that the hay bales were not secured into the unpaved soil in June 2018.

Settling Defendants' Comment: The hay bales will be removed and no longer used as it is impractical to be consistent with the NYSDEC standard by staking them into the underlying pavement. Inlet protection for catch basins ("CB") that are not in travel ways will consist of absorbent socks surrounding the CB inlet along with CB grit bag inserts. CBs that are driven over will continue to be protected by grit bag inserts.

d.  EPA identified the following instances where the Facility's 2018 SWPPP should be revised to provide clarity:

  i.  The SWPPP references Appendix D of the NYSDEC MSGP when it should reference Appendix G.

      Settling Defendants' Comment: The SWPPP will be updated to reference Appendix G.

  ii.  Additional sources of scrap metal accepted at the Facility in addition to automobiles;

      Settling Defendants' Comment: The SWPPP will be updated to include a description of other materials received at the facility.

  iii.  Attachment 2 of the 2018 SWPPP are training materials that reference training regarding the "river magnet" but this device is not specifically referenced anywhere else in the 2018 SWPPP.

      Settling Defendants' Comment: The SWPPP will be updated to specifically reference the river magnet.

  iv.  The SWPPP specifies the area leased by Rensselaer Iron and Steel Inc. from the Port of Albany which does not include the dock and the location where RIS samples and monitors the outfall. The SWPPP does not include a copy of the lease

agreement and does not specify how RIS is authorized to operate in these areas without a lease agreement with the owner.

Settling Defendants' Comment: A copy of the lease is not a requirement for the SWPPP. Nevertheless, the lease provides temporary access to the dock during ship loading, while the lessor/owner (Port of Albany) has not objected to access for outfall monitoring.

   v.   The SWPPP does not include "Vehicle Storage Area" in the list of Area E activities.

Settling Defendants' Comment: The SWPPP will be updated to include the Vehicle Storage Area on the list of Area E activities, as depicted on site map.

  vi.   The SWPPP site map does not depict the following:
        1.  Drainage area size for each outfall; and
        2.  Spill kit locations.

Settling Defendants' Comment: The NYSDEC MSGP requirements for site map contents, described in Part III.A.6, do not require that drainage area size be provided - only an outline of the drainage area, which is included on SWPPP figures. As for spill kit locations, the MSGP only requires a discussion of spill response procedures, which is included in the SWPPP narrative. Use of spill kits is further described in the facility's SPCC plan.

 vii.   The use of absorbent rolls along the dock is mentioned in the SWPPP narrative but has not been included in the relevant BMP section.

Settling Defendants' Comment: The SWPPP will be updated to include discussion of the absorbent rolls along the dock in the BMP section.

viii.   Attachment 9 of the SWPPP contains forms for catch basin inspections, filter replacement, oil absorbent sock replacement and Sump and Hood maintenance but does not specify in the narrative how the forms will be utilized.

Settling Defendants' Comment: These forms are filled out by the Facility Manager. The SWPPP narrative will be updated.

  ix.   The forms utilized for control measure inspections in Attachment 9 do not document degradation beyond just free of debris such as holes or structural issues.

Settling Defendants' Comment: It is generally understood that in assessing the BMP effectiveness (as included on the inspection form), the presence of holes, gaps or any structural damage to the BMPs would be noted.

EPA's Response: These forms shall be modified to expressly include a section to note whether holes, gaps, structural damage, or other degradation are observed.

x.   The 2018 SWPPP states that inspections of the rail car and ship loading areas will be conducted quarterly and that the dock will be cleaned immediately after loading operations. In addition, according to the SWPPP, rail cars are loaded daily and ships are loaded monthly or bimonthly. It is unclear if inspections are conducted subsequent to loading operations in conjunction with the cleaning operations.

Settling Defendants' Comment: Scheduled inspections occur quarterly as noted in the SWPPP and may or not coincide with loading or cleaning operations.

# Appendix B



**Figure 2**
Drainage Plan
Rensselaer Iron & Steel
Rensselaer, NY

HUDSON RIVER

IMPAIRED WATERBODY NY1301-0002. IMPAIRED FOR
FISH CONSUMPTION DUE TO PRIORITY ORGANICS (PCBs)

UNCLAIMED PROPERTY
OWNED BY PORT OF ALBANY

AREA F

TOP EDGE OF CONCRETE WHARF
EDGE OF CONCRETE

HUDSON RIVER

TOP EDGE OF CONCRETE WHARF

STORMWATER COLLECTS AND
INFILTRATES IN THIS AREA

DRAINAGE AREA #2
TO COMBINED SEWER
OVERFLOW SYSTEM

STORAGE
BUILDING

AREA C

AREA E

MAINTENANCE
BUILDING

AREA D

STORMWATER COLLECTS AND
INFILTRATES IN THIS AREA

AREA B

OFFICE

AREA A

OUTFALL 001 TO HUDSON
RIVER (STORMWATER
MONITORING POND)

48 IN
RCP PIPE

STORAGE
BUILDING

RIVERSIDE AVENUE

## NOTES:

1) ALL DRAINAGE STRUCTURES ARE SHOWN AT
   APPROXIMATE LOCATIONS

2) SUB-DRAINAGE AREAS ARE BASED ON CLIENT
   DESCRIPTION AND SITE VISIT

3) HUDSON RIVER IMPAIRMENTS BASED ON NYS FINAL
   2014 303(d) LIST OF IMPAIRED WATERS

4) BASE PLAN FROM 2013 SURVEY BY DAVID A.
   FLANDERS SURVEYING & SITE CONSULTANT, PLLC

PARCEL LEASED TO
NEW CASTLE ASPHALT, LLC

━━━  Potential Berm Location

## LEGEND

- DRAINAGE AREA to OUTFALL #001
- DRAINAGE AREA to CSO SYSTEM
- BUILDINGS
- DRAINAGE ARROW
- DRAINAGE PIPE
- SANITARY SEWER
- SUB DRAINAGE AREA BOUNDARY
- DRAINAGE AREA BOUNDARY
- PROPERTY BOUNDARY (LEASED)
- RAILROAD TRACKS
- MANHOLE
- CATCH BASIN
- AREA OF INDUSTRIAL ACTIVITY

OMH
CHB
AREA

0  62.5  125  Feet